May it please the Court. My name is Hillary Fox and I'm representing Petitioner Brenda Levy in this matter. I'd like to apologize at the outset that I have rather a bad cold, so I'll try to speak up. The petition here raises two important issues. The first, which I'd like to address, is the Batson claim. The trial court in this matter, of course, is operating under a stricter standard, and this Court has found applies on the Supreme Court's Batson ruling to claims that jurors were discriminated against. So this Court is reviewing the petition and de novo in this instance. The correct standard, as the Court has recognized in Paulino and other cases, is not an onerous one. All the defendant or the petitioner needs to make out is a reasonable inference that there was discrimination in the prosecutor's use of preemptory challenges. The court should err on the side of the petitioner's right to a fair and impartial jury. The Batson case also made explicit that at this stage, the prima facie stage, the defendant is entitled to rely on the fact that the preemptory challenge system constitutes a system which would permit one with a mind to discriminate to do so. The petitioner cited three different bases for finding a Batson prima facie case here. The first is statistical evidence. We went through that, and I think what I'd like to – it's pretty well laid out in our brief. Not nearly as striking as in Paulino, is it? I'm sorry, Your Honor? Not nearly as striking as in Paulino. In Paulino. You courted Paulino. You should know it. I know, and it's Your Honor's opinion. It's not as striking, but I think that it falls well within Turner and Fernandez and other cases that this court – certainly the Fernandez case, and Turner also. Not as striking as almost anywhere. I mean, there's no case that's quite as weak as this one that we've actually had Paulino investigate. Well, Your Honor, we – If I look at the numbers graph here. Well, Turner was five out of nine challenges. Five out of nine is a little more than half, right? Yes. Yes. What we have here is using two out of seven challenges to strike two out of five African-American jurors. Let me do this. At the time, what they called – because it's California and they don't seem to like the name Batson – what they called a Wheeler challenge, there were two preemptory challenges of African-Americans, and at that time, two African-Americans had been permitted under the jury. That's correct. So it's a 50 percent preemptory challenge rate at the time the challenge is made. Thank you, Your Honor. That is correct. At the point that the defendant made the motion, half of the African-Americans had been struck from the jury. And so after that, of course, the prosecutor refrained from striking the final African-American. With the sample size. What if there had only been two African-Americans in the denier and one of them was struck? That would still be 50 percent, wouldn't it? That's correct. And that's – I think the court raises an important issue, which is, well, we know that it's illegal to discriminate against even a single African-American juror, but we also know that striking a single African-American juror, even if that's the only African-American on the denier, is not, per se, a prima facie case. So that's why we've moved in the way that we have, which is to say we think the statistical evidence puts us within the reach of other cases. But then, because we have a relatively small sample, five, two out of five struck, the court can look at other relevant facts and circumstances, which is what Batson directs. You said two out of five again. I'm sorry. I think your sample is smaller, but your percentage is higher. That is to say it's two out of four, which is at the time the challenge is brought. The court is correct, and I apologize for making that error a second time. There were five PM3 challenges, two of which were exercised against black jurors. No, Your Honor. I didn't mean to say that. I meant that there are five African-Americans on the denier, and at the time of the motion, two were seated and two had been struck. Three more left. After the motion was pending, one was left. How many PM3s were exercised? Seven, and two of them were against African-American jurors. So we then ---- At the time of the challenge, we know that two African-Americans had been challenged. Do we know how many non-African-Americans had been challenged at the time of the Wheeler motion? At the time of the Wheeler ---- Your Honor, I'm sorry. I don't have that in my head. I can figure it out, but your statistics were that the prosecution used seven challenges total, two of which were used against African-Americans. That's correct, and so what we ---- But the statistic we then derived from that ---- How many challenges did each side have? Your Honor, again ---- Did the prosecution use all of its challenges? I believe they did, yes, Your Honor. I believe so. The statistic we looked at was what's the rate at which the African-Americans are being challenged compared to their percentage in the jury pool. We found that they, although they were only 16% of the jury pool, the prosecution was using 29% of its challenges against African-Americans. And how do you get 29%? I'm so sorry, Your Honor. I don't hear well today. Two out of seven? Two out of seven is 29%? Yes, 29%. I did it with a calculator. I hope that's correct. We then looked at the ---- I hope that's correct. I think that is correct. Sure. We looked at the Alvarado case in the Second Circuit that said when you find a strike rate that's twice the proportion of the minority group in the jury veneer, that itself can be evidence of discrimination. If they're being struck at twice the rate that non-African-American jurors are being struck, that should raise the ---- With such small absolute numbers, any additional juror who's struck or any additional use of a peremptory challenge, of course, is a very large percentage. Which I think is why it's also appropriate at that stage, when you're looking at all the relevant facts and circumstances, to go to our next step, which was the comparative juror analysis. Because there has to be some way to vindicate a juror and defendant's rights if one or two African-Americans are struck. And in this case, I don't know if the Court's going to accept it or not, but we had complemented our briefings with a declaration filed in a different case about a different issue that happened to mention in the district attorney's declaration that there was a policy of striking African-American women off capital juries during the time that Mr. Leiby's trial occurred. So if that is true, and it's not something that I think we're establishing in our case, but if that was true, that would be a problem. Were they both women? They were both women. And the three African-Americans left on the jury were all men. And did you bring a JEB challenge? That is to say, did you bring a gender-based challenge? There was no gender-based challenge brought below. And as the Court's aware, there's no conventional class of African-American women in federal court. But I think what's important about this is that if, for example, we were able to prove at an evidentiary hearing on remand that the women were struck because they were African-American, then the fact that black men are allowed on the jury doesn't make it all right, obviously, for the prosecutor to be discriminating against black women on the basis of their race. But the argument is they would have... So you're trying to get the gender in that way, that is to say... Well, I think that... That is to say white women are allowed on, African-American women are not allowed, and therefore... Exactly, Your Honor. These women would have been seated but for their race. And so when we have a situation like this, which I anticipate as the litigation proceeds in the Freeman case, a fuller record will develop regarding the number of African-American women that have been kept off juries in Alameda County, you have to understand that in every case there will be African-American men that were left on. But it doesn't mean that there wasn't race discrimination. There was. It was only exercised against the women. So that's why when we look at the comparative juror analysis, we have another chance to say, well, what was going on here, looking at all the facts and circumstances. If you compare the rate of challenge to African-American women to non-African-American challenge, what are those two rates of challenge? No, Your Honor, we did not parse the numbers about the number of women struck. I think we put in a footnote in the brief that there were some women, also women with Hispanic surnames that were struck. I wonder if you're going to make me that argument, that among the group of women, the challenges are based on race. Your Honor, that's an excellent argument, and I have to say in all the briefing we didn't think to approach it that way. I think what we were looking for was race. We have a race case, and these women were not seated because of their race. And so we compared them, putting gender aside because gender had not been exhausted or preserved, we compared them to all the other jurors. Was the victim white or black? The victim was black. Both the victim and the defendant were black? Yes. How about the officers? Susan Watson, I was not present, and I don't think their race is a matter of record. It's not been pointed out that they were African-American. So the comparative analysis, again, we thought supported us. We think under Millerell and other case law, the court can also look at the racially disparate mode of questioning, which was an interesting point. The respondent here contended that the striking of the two African-American women was susceptible because they had been questioned before being struck. But if you look at the record, what you see is that they were the only jurors who were questioned. Of the last, I think it was seven jurors that were far dear, the prosecutor only asked questions of the two African-American women. I think in that circumstance, the court can suspect that perhaps the prosecutor was looking for a challenge for cause with those particular jurors. And your narrative there. I think I heard you say, but I might have misheard, and I can't reconstruct this from my own knowledge of the record at this point, you say that there was questioning of these two women before they were peremptorily challenged. And you said something about the lack of questioning before. Was any prospective juror, except these two women, against whom the peremptory was exercised? Were any of those people challenged, excuse me, questioned before the peremptory was exercised prior to the disqualification of these two? And again, that's an interesting question. Were any of the peremptories preceded by questioning besides these two? That I don't know. The point that I was making was a little different, which was just of the last seven jurors who were presented for challenge, the only two that the prosecutor questioned were the two African-Americans. So seven jurors were up. The only two that the prosecutor asked any questions of were African-American. Do we have in the record the full transcript of the entire war, dear? I believe so, Your Honor, yes. So we can go back and find this out? You can, and I apologize that I didn't do that for you. This is what you have done in, where was this? Alameda County, Your Honor. Alameda County. I mean, do you know the answer to this? Your Honor, I'm about to plead real ignorance. I'm a federal public defender, and I have never practiced in state court. I apologize. I mean, I've read the record, but I don't have any. It feels strange how it's done, in my experience, at least in Los Angeles County, in that not every juror gets asked questions. It's a panel, and then the lawyer will ask questions of this juror and this juror. I mean, I'm sorry, not the juror. There are potential jurors. So it's not at all unusual to have no specific questions directed to many of the jurors at all. It's not like it's sequential. You ask one juror, the next juror. There's sort of a scavenging approach. Well, I think, Your Honor, the record here would show that there was sequential questioning of the jurors. I believe that they had questionnaires. The judge would ask each one, give all your answers to the questionnaire, and then give the lawyers an opportunity to add additional questions. One by one? One by one. I'm afraid this is outside the record, but of the many juries I have not sat on in Alameda County, but I have been there on several occasions and never been seated. What I have observed is that there's a general question, sort of, if this is true, raise your hand. If that's true, raise your hand. And after that general questioning, the lawyers are given an opportunity to question individually. But do they do it sequentially? Well, yeah, they do it one after the other. That is to say, after the group questions are asked, the lawyers have a chance to ask them individually. And, of course, once it's individual, it is one after the other. Right. The other thing that appears to me is that it's quite different than Los Angeles was. I actually did sit on a jury, and they put a box of 18, and then anybody over 18 can be subject to a strike, and the lawyers get up and ask questions to a number six or a person in the number 12 position, and it's quite scattergun. It's not all systematic. So it would be very difficult to tell under that system. I think our system must be different because I know, Your Honor, that we determined that each of these jurors were struck at the first possible opportunity after they were seated. I see. So they were seated. They may have been filling in for another juror who was excused. They were seated, questioned, and struck at the first possible opportunity, and that was another factor we relied upon. Because I'm running short on time, I have another issue that I'd really like to address. You believe you can tell who was asked questions and who was not asked questions. There was sort of a sequence, and so there was a chance to ask questions that was passed up and asked to each. Yes, I do believe that. Okay, that's what I was trying to get at. Okay, go ahead. The second issue that we have, of course, is the juror misconduct claim, and the respondent has raised issues about exhaustion, which I think are very interesting and I'd like to address if I may. The concern here was that the Baldwin case in the Supreme Court indicated recently that in order to preserve or give the court a fair opportunity, the federal nature of the claim must have been presented to the lower court through citation to federal law or a case discussing federal authority. And this court had already held that citation, or has held in the Peterson decision, I'm sorry, that citation to a state case, which is what happened here. I'm sorry, I should have started sooner. The petitioner fully briefed the federal issues to the court of appeals, the state court of appeals. In his petition for review, his briefing focused only on whether or not the misconduct was prejudicial and cited just to a state case, People v. Nestler. In the district court, of course, we fully briefed the constitutional nature of the claim. The respondents contested that citing to People v. Nestler in those circumstances wasn't sufficient. And we, in the reply, made the argument clear, but I think there's a distinction I wanted to draw here. First, we relied on the Ilst, is it Ilst, presumption, which is that where in a case like this the federal claims were fully briefed to the state court of appeals and resulted in a ruling that addressed the federal nature of the claims. When the Supreme Court subsequently affirmed the court of appeals ruling without a written decision, we can presume that they relied upon the same federal claims that were relied upon by the court of appeals. Now, it was subsequent to that case that the Supreme Court decided Baldwin, and this court, I think, has questioned in the Casillo opinion whether or not the Ilst presumption should survive Baldwin. And I just wanted to point out that our case is not Baldwin. Our case is much more like Sandgate in that it's a case where the claims were fully briefed, the court of appeals ruled on the federal claims, and the Supreme Court affirmed. In Baldwin, the situation was the petitioner was seeking discretionary review, and the petition for review was denied. And apparently the petition didn't make any reference to the federal nature of the claim. So in Baldwin, the Supreme Court said, we're not going to require the Supreme Court to read all the lower court briefings and rulings to figure out what kind of claims are being presented to it. And the Ilst presumption survives because here we have a Supreme Court that isn't just denying review. We have a Supreme Court that's actually affirming the court of appeals opinion. So to the extent that NIFA was not sufficient, a state court case not sufficient, the Ilst presumption would apply to preserve the claims. But more importantly, under Peterson v. Lambert, this court has recognized that when you cite a state court case that fully addresses the federal constitutional issues, as NIFA does, it would be a sign of disrespect to our state court judges to suggest that the citation to a state court case itself is not sufficient to alert the court to the federal nature of the claims. What the court has held is that a state court, like a federal court, can address federal constitutional issues. So if you cite the appropriate state law case, a state case that addresses federal law. I find that totally convincing. Who wrote that? Your Honor, I just was trying to get the two opinions here. One of the junior judges. The potential would be in conflict. But I think the judge for Ivey's opinion in Castillo is not, in fact, in conflict, at least on our facts. We really have a Sandgate case where exhaustion is not the problem. Because exhaustion is not the problem, the district court here didn't deal with exhaustion, assumed there was misconduct, and then found no prejudice. Since I'm short on time, I just want to address the prejudice. Unfortunately, this is a little bit complicated also to understand why it was so important that the jury, when the jury heard from one of the jurors that the testimony in court about defense was wrong and that the distinction that the defense attorney had been trying to make had been, in fact, pinning his case upon the distinction between going through offense and over offense. According to this juror, there was no difference. It was all the same. Highly problematic for two reasons. And I'm almost out of time. I want to point out that even the trial court seemed to understand that the defense case rested on this distinction. Because each time in rejecting the finding that there was no prejudice, the trial court would say, well, I don't think that it was very significant. Besides, it only went to the defense argument. Or it only went to the issue of officer credibility, which the defense argued. But that was the defense case. And the fact that the trial court didn't think that the defense case was significant. Your case depended upon the officers being mistaken about how he got from one side of the fence to the other side of the fence. And an inference from that, that if the officers were mistaken about how he got from one side of the fence to the other side of the fence, that they might have been mistaken about other things that they saw. That was one. The inference that they should be mistaken. On the fence, yes. No, there is. There is. Because the issue for intent, did he have intent to steal? Defense only had two arguments for defense. One was that he didn't have a, unlikely to have formed the intent because of his background and psychological testimony showing he was borderline mentally retarded, had been severely abused. And so when he saw authority figures coming, he just fled. That was one argument. That explained why he fled, because he was terrified and he couldn't make quick judgments. But the second argument was when he got to the fence, he was happening to hold the jacket. He just ran through and dropped it. And that was very important because the government was arguing that he had thrown the jacket over the fence in order to make sure he could keep it and then climb the fence and continue to run. And the defendant argued, no, I ran through. I just dropped it. I was scared and said that I only had the CD Walkman player on me because I'd actually put it on and I couldn't get it off that quickly. So in that moment of flight when he saw the police coming and he was terrified, and it's, again, a borderline mentally retarded man who doesn't think very well, he just knew to get out of there. And he wasn't intending to permanently deprive Avery of the CD player or the jacket. He just ran because he was scared. And the problem for us is that when the juror gets in there and says, oh, you know, that fence, it wasn't eight feet high and it could have looked the same, the defense had no way of knowing that the jurors were getting this extrinsic evidence. We know that it mattered to the jurors both because the declarant It's either extrinsic evidence or it's life experience, you know. It's a fine line. And where is your controlling Supreme Court authority saying that this kind of thing is not permissible? A member of the state maybe is here. And maybe on deck up here would say this is not okay, but is this really any different from a juror saying, oh, no, it's really easy to throw a ball, you know, throw a jacket over a fence. I've done it often. No, I think it is different. I think it's specific facts about an issue in evidence. It's like specific facts about a defendant's background or about the crime scene. And the juror, as I understand it, said I know that fence. Exactly. It's the specific fence. It's not I know how the death penalty is generally applied. People that get life never do life. So what? It's not about fences fall down. It's that fence. But so what? Because that fence was the subject of substantial testimony at the trial. And where is the constitutional fault here? The fault is that the defendant had a right to have his trial decided based on evidence that was presented to which he had an opportunity to cross-examine and object. It's one thing if the juror has evidence, has something, and Wardier doesn't disclose it. Then you've got a juror who lies during Wardier. You've got another thing where the juror brings something into the juror room contrary to instructions of the judge. You know, don't bring a dictionary in. Don't go do this internet research and whatnot. And the juror goes in. That's juror misconduct. But none of those apply here. We have the juror who, in the midst of deliberations, realizes, you know, I know this fence. And where is the case of the Supreme Court case that says that is an assumption of denial of due process? The Supreme Court case you're on is Head v. Hargrave. It's a very old, well-established case that says that in deliberating, while jurors may act on their own general knowledge and ideas, they cannot act in any case upon particular facts material to its disposition resting in their private knowledge. Aside to Hargrave, I don't recollect that case. I probably should, but I don't. Aside to that is 105 U.S. 45, 1881. And we cited it on page 45 of our brief. It either means it's a deeply rooted authority or it's been disregarded for many years. Okay. But I think, Your Honors, I am over and I had forgotten to reserve any time. So I suppose I'm... Is that the Supreme Court case? Yes, Your Honor, it is. I mean, you know we need one of those. I do need a Supreme Court case. Absolutely. We need one of those. Yes, you do, and I have one. And I think because I think the principle is clearly articulated in Head v. Hargrave, I don't think it's ever been overruled. And I think... A case like this where the juror had evidence or had information that he just happened to have from his past experience. Yes. Yes. And I think it had to do with the railway, and I don't exactly remember. But it is the case that we cited. We only cited cases that were on point. And what we have here is not a case in which it was general knowledge. It was very specific about this sense. And I think the issue about the juror's view of it contradicting the evidence, it wasn't cumulative. I mean, the court has suggested that it would take a very narrow approach to finding something to be cumulative, especially at a criminal trial where the defendant does have a right to cross-examine about the evidence that comes in. It was very damaging to the defendant's case because we know that after receiving this evidence, the jury asked for readback about the testimony. Not only the testimony about Mr. Levy's flight, but the testimony, but what the officers saw as they approached, which, as Your Honor pointed out, was the other testimony affected by... Just to make sure, you're not making any claim that the juror concealed anything, did he, or did he not? Because often the court will say, are you familiar with the crime scene? Are you familiar with the witnesses? There are questions like that. You're not saying that there was anything the juror did here to conceal his knowledge. I mean, I'm just... Well, Your Honor, the juror did not admit that. The record reflects, as we pointed out, that the jurors were questioned about whether they had any familiarity with this neighborhood. So they were questioned about that, and the juror... The question, do you know the neighborhood? It was the 25th or 21st in San Pablo. Raise your hand. And apparently the hand was not raised. Right, and he did not respond. Several questions were asked about that. He did not respond. He indicates in his declaration that it didn't really occur to him until later. So we don't think he was trying... According to his declaration, he was not trying to sandbag the defendant. He simply didn't remember until they were in deliberation. However, at that point, he didn't keep it to himself. It might have been a problem even if he had, but he didn't. Instead, it was the first thing he did when he got in the jury room was to tell everyone else. And so he didn't influence just his own verdict. He potentially influenced the deliberations of the other jurors. If he wasn't a holdout, nobody told the court, hey, you should take him off because he... I wish we'd had a different jury, maybe. But I will say the other thing the court should take into account in deciding whether there was prejudice is that this was not a signed-on case for the government. Mr. Levy was acquitted of robbery and attempted robbery. He was only found guilty of the petty theft with the prior. Did the jury know at the time that they were hearing this and deliberating that this was a three strikes case? Well, Your Honor, the jury knew that they had to make a finding about four prior felony convictions. From which they could have inferred. They could have inferred. They could have inferred that he was on trial for three strikes. But I don't know that they were permitted to introduce any direct testimony. But it wasn't a strong case. Even with respect to the petty theft verdict, the jury struck the allegation that he'd taken $50. But then the victim's testimony, not credible on that point. And the whole point of Mr. Levy's defense was to hope that the jury would find a ring of truth to it. Because he's a very simple man. He wasn't facile on his feet. But nonetheless, he had one story. He stuck to it. He knew details about his story. He said when he picked up the CD player to try it out because he'd never tried one before, he didn't like the Tony Braxton tape or the rap tape, so he put in a Tony Braxton tape that was also there. There were very specific details that corroborated his story of what he had done that weren't at all compatible with an intent to steal. Someone who was intending to steal the Walkman would be unlikely to pick it up, figure out how to put it on, and start changing the tapes as you stood by the car of your intended victim. Mr. Avery's story was, of course, that there'd been a solicitation going on. They'd hacked him over the price. There'd been some interactions after that. But he was just waiting around, having scared some other would-be thieves from the victim's car. He was waiting around and wanted to try out the CD player. Then when the police came, he froze and was frightened, and he fled. So the issue of his intent to steal, his intent when he left the car with the items, was central to the case. The defendant had admitted taking the items. He'd admitted taking and carrying them away. The only element of petty theft that was at you was what was his intent. And so to then have the jury hear this extrinsic evidence, we don't know what they did with it. We don't have testimony, obviously, in the declaration of exactly the thought processes. But we know that it went to the central issue. We know that they asked for readback after that time, and we know that they acquitted him on two of the three counts. The count for which he was convicted, which was petty theft, was petty theft of what? It would have been the coat and the jacket and the CD player? Well, the jacket and coat are the same thing. I'm sorry, the jacket or the CD player. And the CD player. And there was an allegation about $50, and the jury asked to cite that. I'm sorry. Go ahead. No, no, go ahead. So he gets away with the CD player, which he carries well beyond this hole in the fence. I think he carries it after he runs through the fence and drops the jacket. He's still sort of wearing it, and then he goes and hides behind the garbage can. But he doesn't drop the CD player. No, he doesn't. That's correct. He drops the jacket. But he's just holding it. Whatever the jury might have thought about whether there was a hole or whether he had to climb over the fence or whether the jacket was thrown over the fence or whether he ran through the hole and then dropped the jacket, there still was evidence on which they could have convicted him for carrying away the CD player alone without considering the jacket. It would have been a sort of funny theory because the difference really between the CD and the jacket was that, and there was no contradiction to this, the CD player was sort of affixed to him, and it's not exactly clear how, but because his language was not very eloquent, it depends on when he was trying to question him about whether it went over his shoulder or around, somehow it seemed to strap on, and then the earphones went on. And so his testimony was that as soon as he had an opportunity, when he was carrying behind the garbage can, he took things off and dropped them, but that when running, they weren't items he was holding. The evidence is he dropped the CD player when he was carrying behind the garbage can? Yes. I thought you had given a different answer to Judge Wybie's question, but I may have misunderstood the question or the answer. You answered that he didn't drop the CD player. He didn't drop. I think he was already hiding when he took it off. He couldn't just drop it. He had to get it off himself. How far away was the garbage can from the fence? I don't know if there's testimony about the exact distance. It's within the same block, seems to be kind of a parking lot area, and it's before he tried to scale a second fence to get out. That's when he scaled the fence that was covered with razor and gashed up his hands, but apparently was in such a state of shock or terror that he didn't even notice that he cut his hands over the razor. So by that time, where was the CD player? It was on the ground near the garbage can. That's where it was recovered when they arrested him. So your view of the evidence is that the first chance he got to stop and take off the CD player, he put it down? Yes. Yes, that's our view of the evidence. Yes, it is. It is, because there's nothing to contradict that. I just wanted to make sure I understood your view of the evidence. I don't think there's any other evidence on that point other than Mr. Levy's testimony. We'll hear from the government. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Amy Haddix, appearing for the appellee in this case. With respect to the Batson argument, an appellant puts a lot at stake in a prima facie case being established by these statistics alone, and I disagree with the significance of the statistics that have been presented in this case. As the Court is well aware, there were two of seven peremptory challenges exercised against two African-American jurors. Do you know the answer to the question? At the time the Wheeler challenge was brought, how many peremptories had been brought against both blacks and non-blacks? Yes, because the Wheeler challenge was brought after Velma T., or I believe Rose L., which was the last African-American struck. So there were seven total peremptory challenges used at that time, two of which were against African-Americans and five of which were against blacks. There are a total of seven peremptories used? There were, but I would like to... In other words, the peremptory to the second of the two black women was the last of the peremptories? I'd like to clarify that point. It was the last used, but I do not believe it was the last available to the prosecutor. That's what I meant, was used. So you're telling me, then, that a total of seven peremptories in their case was used and the Wheeler challenge was brought after the second challenge to the African-Americans. So at the time of the Wheeler challenge, the peremptories exercised were two against African-Americans and five against non-African-Americans. That's correct, Your Honor. And I'd like to point out that in the record, the record reflects, at the exit to record page 181 and 185, that after the Wheeler-Batson motion was made, the prosecutor passed three additional times on his challenges, which indicates that the prosecutor had additional challenges left. And during that time, he passed on one additional African-American juror. Well, that's fairly common practice. That is to say, one of the things that happens when a Wheeler challenge is brought is that the prosecutor quits challenging African-Americans. I'm sorry. Maybe I've misspoke. What I want to point out is that the prosecutor had additional challenges to use. It wasn't as if he had exhausted his last challenge on Rose-L. He had additional challenges. He declined to use those, and that was against one additional African-American who was called to the panel after Rose-L. And I understood you perfectly. Okay. It is a common tactic in these trials that once the defense raises a Wheeler challenge, that's okay, prosecutor. You've had as many free bites as you're ever going to get. If you take another one, you are in big trouble, and the prosecutor then tends not to use peremptories against African-Americans. I do understand that point, and I believe that is at the heart of this court's observations today, that at the time the second challenge was used, there was a 50% essentially disparity between two African-Americans who were left on the panel and two that were struck. Ultimately, three remained on the panel, and I think this court has queried whether it would be appropriate to consider that statistic, which actually amounts to only a 40% ratio of African-Americans struck to those that remain. Aren't we supposed to decide whether or not there was a prima facie case at the time the challenge was made? Well, Your Honor, in Wade v. Carhoon, this court observed that we do not believe the only relevant time at which to assess the would-be prima facie case is at the time of the challenge. Who wrote that? You did, Your Honor. So I think you've gone on record that at least it's possible that one can look at the final numbers and not just the numbers made at the time of the challenge. Is that only with respect to prima facie case, or is that only with respect to justification thereafter? Well, as I believe Wade v. Carhoon was involved with prima facie challenge, you obviously know the case better than I do, but I believe the comments were made in that context. I'd also like to distinguish. You pretty much have to be able to look later on, because if you could have the first challenge be a black, Jewish, Hispanic, you know, whatever. Exactly, Your Honor. That becomes 100%. It's sort of a killer statistic. You're hanging around 100%. That is correct, Your Honor, and I think generally we would look to the final numbers as well as the numbers at the time of the challenge. Now, of course, in Fernandez's instance. On the other hand, given what I think is common knowledge, that once a Wheeler challenge is brought, the prosecutor tends to be much more leery of making preemptory challenges to African Americans. That means that the statistical meaning of the later challenges or lack thereof is somewhat different from the preemptories before. Well, certainly you can take that into consideration. That is true. But ultimately I think it's only fair to both parties to look at the entire range of numbers, not just the ones that were brought at the time of the challenge. To simply what the statistics are, or are we able also in determining whether or not a crime efficiency case has been made out, to the pattern of questioning or non-questioning? Yes. In fact, the fact that the prosecutor engaged the jurors that were struck in some type of worthy tends to suggest that it wasn't based solely upon their race. And in this case, the prosecutor engaged both of the jurors in voir dire before striking them. Did the prosecutor engage other non-black veneer people in the individualized voir dire before the voir dire with these two women? He did, Your Honor. And I don't have specific notes on that, although I have read the voir dire. And the prosecutor engaged several non-black jurors in voir dire, which he struck, and then engaged these two African-American jurors in voir dire, which he struck. Do we know how many he engaged in specific individualized voir dire in addition to the two African-American women? Unfortunately, no, Your Honor. I did not make that count. Figure it out, but you don't know it off the top of your head. You could figure it out from the record, Your Honor. I'd like to make one other comment with respect to the percentages at the time of the challenge versus the percentages at the end when the jury panel was sworn. And in Fernandez v. Roe, this court was faced with a situation where it explicitly decided not to consider the statistics after the Wheeler-Batson or the Batson challenge had been made in that case. But there's a very specific distinction there in which the judge specifically warned the VA after he had struck four of seven Hispanic jurors that if he were to strike another, that would clearly be evidence of a prima facie case. We don't have that type of warning here, and I think that that means that the statistics at the end of the final voir dire panel can be considered. And in this case, they are particularly significant for a couple of different reasons. First, because when you look at the statistics at the end of the swearing of the jury panel, we have only 40% of African-Americans struck, two struck and three left on. And the percentage of peremptories used against minorities was only two of seven, which is 29%. Now, counsel has contrasted that with the number of percentage of minorities in the petite or in the veneer as a whole, which was only 16%, and has pointed out that that number is greater. But what I'd like to point out is that the percentage of the minorities that were left on the petite jury at the end, which was three or one quarter, actually exceeds the number of African-Americans that were in the panel as a whole that were available to the prosecution to challenge. So when you look at the final disposition of the jury panel, you see that the percentage on that panel exceeds the percentage that was available in the veneer, which I think is significant. I also feel it's significant that these numbers are. Why is that significant? It's significant in the sense that a certain number of African-American jurors came up, perhaps more were available than the percentage of the panel as a whole, meaning that the prosecutor might have had an opportunity to strike more than were represented on the panel as a whole, but ultimately the number that were left on is more representative than the number that was available through the veneer panel. Do we know the number not just of the total veneer, that is to say percentages of African-Americans, non-African-Americans, but do we know the percentage of the veneer from whom the jury was actually selected? What I mean is you're going to have 100 people out there in the veneer, and you've worked your way through 60 of them, and you've got your jury. Right. Do we know the percentage of African-Americans and non-African-Americans in, my hypothetical is in the 60, the 60 from whom this jury was actually selected? Do we know that number? Unfortunately, I don't believe that number is clear, and certainly that record was not made by the defense below, which could have been one of the observations that they could make in support of the Time of Patient Challenge. Now, appellants have suggested that it was approximately 16 percent or three of, I'm sorry, five of 31 once all of the four cause challenges were completed. And even that number is not entirely clear. The number that we have for sure is that there were five jurors, African-American jurors, that made it into the jury box, three of which were, or two of which were excused and three of which remained. That's the number that we have that is clearly established by the record. I feel that these numbers are strikingly similar to the numbers that were presented in Wade versus Terhune, in which this court found no prima facie case of discrimination. There, the prosecutors struck two out of three African-Americans, leaving one on the jury. For one juror, there was no obvious reason to strike the juror. For another, there was an apparent reason that appeared on the face of the record, although the prosecutor was not asked to state his reasons. And this court found that there was absolutely no prima facie case shown on that record. This is strikingly dissimilar, I would say, to the situation presented to this court in Fernandez versus Rowe and also in Polino. In Polino, you had five out of six jurors struck, or 83 percent, with only one remaining on the jury. And in Fernandez versus Rowe, you had four out of seven Hispanic jurors struck and two out of two African-American jurors with only one minority left on the panel. In both of those cases, the statistics alone are much more egregious than the statistics that we have here, which is essentially two jurors struck and three jurors remaining. There's been some discussion here today and an undertone in the appellant's briefing about the difference between African-Americans and African-American women. And I'd like to strongly object to any suggestion that this court at this point in time could consider a challenge to African-American women. That was not the challenge that was made in the superior court, either at the trial level. And the trial court was clear in asking the defendant about that issue. Are you challenging African-Americans? And the defendant said yes. So it would be unexhausted and inappropriate, I think, at this stage of the litigation to convert the challenge into African-American women, which obviously would be 100 percent. And as this court has already observed, we don't have any statistics with respect to women in general versus men challenged. So at this point, I think it's inappropriate to- Do you have any statistics because they're unavailable on the record or we just haven't quite figured out what they are yet? No one has calculated them, but more importantly, the state court was not asked to calculate them. And I think under an ADPA case that it would be inappropriate to look to those statistics at this time, which I would also like to just make a brief comment about the motion to supplement the record. I'm not sure if this motion, if our opposition has made it into the court's hands. Unfortunately, we filed a late opposition on Monday, and it is untimely. So we stated some reasons for that there. But I did just want to at least verbally object to the consideration of a declaration prepared by an Alameda County District Attorney in a different case, considering what he claims to be the policy back in 1986 as not at all relevant or considered either by the state court or the district court in this case with respect to a challenge that was made in 1997. The other point I'd like to make about that- The objection is that 1996 and 1997 are too far separated. I may have misspoke, 1986 versus 1997. So I apologize for that. I think, obviously, this court is well familiar with the rules of augmentation, and none of the cases cited by the appellant stand for the proposition that you could augment with extrinsic evidence unrelated to this case, not a part of the state court record below, which is generally where the court tends to exercise its discretion. As if, for example, a piece of the state record was not presented to the district court but is dispositive, say, on an issue of exhaustion or something like that. Here, this is prepared in an entirely different case with a different prosecutor over 10 years' difference in time. And, of course, that prosecutor was talking about policies and capital litigation, and this was not a capital case. So for those reasons, we would object to augmenting the record at this time. There's been some discussion about the use of comparative analysis and whether that's appropriate to bolster a prima facie showing. We've strenuously objected to the use of comparative analysis in this case for two different reasons, both because the California Supreme Court has found that it's inappropriate to do that for the first time on appeal, which is exactly what the situation would be in this case. There was no attempt made at comparative analysis before the trial judge. It's only in the state appellate court that the defendant, for the first time, attempted to do that. And our California Supreme Court has been clear since People v. Johnson in 1989 that that type of comparative analysis is not appropriate in California and is not allowed. I'm not following you. What are you referring to when you say comparative analysis? I'm referring to the idea that the court on appeal, either the state appellate court or the federal court, could look to the characteristics of other jurors that were left on the panel, try to find similarities between those jurors and the jurors that were struck, and then from that make an inference that a prima facie case has been shown because nothing distinguishes the jurors other than their race. That's the common, from what I understand, use of comparative analysis and what the appellant was trying to accomplish in this case. State law does not allow this, and therefore federal law. I'm not sure I follow you. Yes, let me be more specific. State law does not allow this type of comparison for the first time on appeal. Our state Supreme Court has concluded that the statistics are, or that on the cold record, it's virtually impossible to discern similarities or differences between different jurors and to give those any type of credence. Is that a procedural default argument? That is to say it is something that was required to have been raised in the state trial court and, if not raised, can't be done on appeal? Or is it something else that says, no, the state court of appeal is incompetent to do it, even if it had been raised? That's correct. The second? I think if I understand your question correctly, yes. The state appellate court, it's not necessarily a waiver issue that you see in a traditional procedural default case. More so that the state appellate court would decline to engage in that type of analysis for the first time on appeal. But that sounds to me like a state law question. And if the federal court thinks that a court reviewing a record can make a relevant comparative analysis for purposes of that, then that's going to be a federal question as to which the state law is not controlling. In that sense, I disagree, Your Honor, because in application of the AABPA, certainly as long as our Supreme Court has concluded that comparative analysis is not constitutionally mandated and that our state courts will not engage in it, then absent contrary U.S. Supreme Court discussion, the federal courts cannot trump the state court's decision in that regard. Well, they said you can never do it. But if they set conditions for doing it and their procedural conditions, I'm not sure I'm bound by that. Well, we are to the extent that the state appellate courts, and maybe this gets back to your question of procedural default. It is analogous to procedural default in that sense. If the state appellate court says we're not going to engage in this type of discussion or look at it to bolster a showing of a prima facie case, and then the question on appeal is whether that's a reasonable application under the AABPA, I would submit to this court that unless there is a controlling U.S. Supreme Court authority that says the state appellate court is mandated to do that, then this court is required to defer to our interpretation of that. We can simply say, no, they're not required to do it. But when we do our analysis, we do look at this. It's in the record. They're not being allowed to introduce new evidence. It's something that's already in the state court record. And the state court is free to make its decision without looking at that. But we're not bound by that. Well, except for the fact, Your Honor, that if this court were to reverse a state court's determination of no prima facie case based upon factors that the state court didn't consider and wasn't required to consider. It wasn't required under state law to consider. Well, and we're arguing that it's not required under federal law either by mandate of the U.S. Supreme Court. And so the point being that it would be inappropriate under the AABPA for this court to reverse a valid state court decision that was arrived at by applying its state court standards, which are not inconsistent with the United States Supreme Court precedent. And under those circumstances, it's not appropriate for this court to defer to its own procedures where the result would be different and not necessarily mandated by state authority in interpreting the U.S. Constitution. Can you discuss the fence question a little bit? Can you tell me why we shouldn't care that the juror brought in his evidence as to, well, I know that fence, and let me tell you about that fence, and here's how it worked. Right. I would be happy to discuss that. I don't know if this court would like to hear any discussion on exhaustion or the question of exhaustion. I have a couple of comments. Maybe I could save those to the end. With respect to the merits of the misconduct claim, the way I see this is I see that this can be broken down into two different issues. First, you have the juror's comment that the fence was in severe disrepair, and it was cut and pulled down to such an extent that, in my opinion, there really wasn't any difference. So I see those as two different things. First, you have the juror commenting on how he's seen the fence. He's physically been at that location prior to the trial. He's making some comments on how he saw the fence. I don't see those comments as significantly different from the evidence that was adduced at trial in this case. At trial, they adduced a stipulation that said the fence was falling down, although part of it looked okay, and there was a hole in that fence that a person can walk through near the end of the fence or a quarter of the way there. So in asking the question whether this is extrinsic evidence, it is true that the juror had been at that location. There is no question. He didn't go there during the course of the deliberations or with the purpose of assessing evidence related to this case. It was gone by then, wasn't it? That's right. The fence was gone. And what I'd like to point out is when this court is grappling with the question of the difference between common knowledge on the one hand and extrinsic evidence on the other, it may be true that the juror's observation of the condition of the fence is specific to this case and is essentially commenting on the evidence in this case. But what I'd suggest is with respect to that comment, there is really no material variance between what the juror said and what the stipulation of evidence was in the trial. What I think opposing counsel appellant really objects to was the juror's then conclusion that in his opinion, there is really no difference between climbing over it or running through it because it was that opinion that tended to undermine the credibility contest that was set up between the defendant and the officers. And with respect to that opinion, I don't see that as any difference than common knowledge that a juror brings, say, for example, from his, in Rodriguez v. Marshall, from a juror's attempt to discern the makes and colors of cars on the freeway or from, for example, Hard v. Burlington Northern, another Ninth Circuit case, where the juror makes some comment about the reading of x-rays. I mean, what- You can't believe that. That is to say, this juror has very specific knowledge about this particular fence. It's not common knowledge about cars on the freeway or how x-rays work. Right. The issue for me would be bringing that very specific knowledge in has what impact upon the jury's deliberation. Right. It's not general knowledge about cars or colors or x-rays. It's this- I know this fence, and let me tell you about this fence. I do recognize that, Your Honor. And to the extent he made some comments about what- that the fence was in severe disrepair and it was cut and pulled down, that certainly is extrinsic to the evidence that was presented at trial. But it's also, in my mind, cumulative and not necessarily any different than the evidence that was presented at trial. But the evidence presented at trial was in conflict. That is to say, the defendant says, I went through the hole in the fence and I dropped the jacket. That's correct. The officer says he threw it over the fence, but then after he went through or over whatever he did, he then didn't pick it up. That's correct. From which there are two very different things that can be inferred. One is, I'm thrown over the fence because I want to keep it, then maybe he changes his mind thereafter. Because throwing it over the fence suggests a very clear motive of, I want to keep this with me. Whereas running through the fence and dropping it suggests quite the opposite. I understand the distinction and I agree, but I don't think that the extrinsic evidence, which was the juror's comment in this case that I have seen this fence and it was in extreme disrepair and cut down, had really anything to do with that ultimate debate. And it was really no different than the stipulation that was entered into trial. So then the juror engages in a deliberative process and says, say for example, if the juror were simply to have said, you know, I'm looking at the stipulation, and it says that the fence was falling down but part of it looked okay and there was a hole here and we don't know exactly where the hole was, in my opinion, maybe these two recitations were just two different interpretations of the same thing. And then the fence is falling down, maybe you jumped over it, maybe you ran through it, maybe you couldn't really tell the difference because of the condition. There's a bit more than that because if you say you've been there, then you sort of put your own credibility at issue with other jurors. If they heard the evidence differently than you described it, then you also have a conflict there. Basically you're calling the one juror a liar or questioning his perception or his veracity or whatever. So there is that aspect of it, but the juror, simply by testifying, has put himself in a position of not being entirely objective about the fact that he's not a juror. There's also the additional weight that's likely to be given by the jurors to the conclusions of somebody who's actually been there and observed the scene. I think the tendency would be, when you have conflicting testimony, to trust somebody who says, I was there, trust me, this is the way it is. So there is that effect, too. So I don't think one can separate it quite as cleanly as you do between sort of cumulative evidence and conclusion. I'm more concerned about the question of whether this is where the constitutional violation is here in the contravention of what the Supreme Court authority is that says this is not okay. Okay, if I may address that. There are sort of two separate theories. One of them is that he simply lied or that there was some sort of material misstatement at the time he was voir dire. So then we get into the area of a juror who maybe has committed misconduct by misrepresenting at the voir dire stage. And then there's the sort of separate issue of introduction of evidence to the jury that hasn't come to the courtroom. What do you think is a controlling Supreme Court authority on those points? Well, Your Honor, from what I understand, the United States Supreme Court has drawn a distinction between essentially common knowledge and extrinsic evidence. Now, the question of whether this was a juror's actual bias or misconduct, it was never alleged below that the juror intentionally withheld information that he knew about the crime scene, that he knew from the time of voir dire that he was familiar with the crime scene and intentionally withheld that. So any cases dealing with that type of bias, I would say, are inapplicable in this circumstance. There was no allegation to that effect. That was not litigated in the state court. And, in fact, the juror's declaration – But what would have been litigated in your view? I mean, let's – I'm sorry, what would be the issue? Whether he deliberately lied? Yes, I think certainly it could have been raised that the juror withheld information. There could have been an evidentiary hearing in the state court at the new trial motion, whether that information was withheld deliberately or whether he understood the nature of the questions that were posed to him, and whether that evidence say, for example, some actual bias on the part of this juror. And you certainly have cases in which jurors intentionally withhold an interest that they have in the case in order to get on, and there are certain standards that govern that. And I don't think those standards apply here. Okay. There really wasn't any suggestion of that. So what we have in the state appellate court is a discussion of juror misconduct based upon essentially extrinsic evidence, which is then, of course, what the district court also – how the district court also construed this question. Let's say there was not a deliberate misstatement. The juror was asked a question, and for whatever reason he didn't raise his hand, and that we have to assume more convincing that it dawned on him later. He said, wait a minute, I was at that fence. I think there's no misconduct at that point. Yes, I would argue there hasn't. He doesn't have a responsibility to come back and inform the court and say, wait a minute, I sent a note and say, I just realized that I was mistaken in my answer. Well, certainly that would be the wiser course, and one would want to see that. That's not the question. The question is whether having realized that there was a misstatement, albeit we assume an innocent one, does the juror at that point commit misconduct by failing to then inform the court of the error? So the deliberate misconduct occurs at the time he fails to then go back and fess up. Right. I don't understand that to have been the argument that was made in this case, either in the state courts or before the district court. What I understand the argument to have been made was that essentially a juror brought in extrinsic information. It may have been obviously at some point the juror became aware that he knew something about this case, and rather than tell the judge, he decided to discuss it. I suppose there couldn't be an argument made that that evidence is some bias above and beyond just the idea of the extrinsic evidence coming into the jury room in and of itself. I don't see that as being the controlling question here. That's certainly not the way it's been analyzed in the litigation to this point. I don't know if I'm answering your question. I know that your question was posed mostly. So you think it's all a question of whether or not the introduction of evidence or whatever it is in the jury room, that that's the only issue we can look at or should look at? Yes. What is the Supreme Court authority on that point? Are you familiar with the case that the Supposed Counsel mentioned? I know that there is the old U.S. Supreme Court case, and there's, I believe, a more recent case as well. I'm not familiar with the Supreme Court has essentially parsed out individual facts that would come close to what we're dealing with here. I think the only authority that I found as far as applying, say, for example, the difference between common knowledge and extrinsic evidence, which is what I see as the debate on these facts. Was this simply common knowledge that this juror had, or was it extrinsic evidence? I see mostly Ninth Circuit cases dealing with that question. I'm not aware that there is a controlling U.S. Supreme Court authority that says something like this is inherently extrinsic evidence, which essentially amounts to juror misconduct. Well, we've been given the Supreme Court case by the other side, and I guess we'll – Yes. I'm afraid I'm going to have to read it. I apologize. I do not know the specific facts that underlie that case, so I cannot comment. I've certainly discussed several Ninth Circuit cases and tried to attempt to distinguish which ones were extrinsic evidence and which ones were simply common knowledge. I'm not aware that there's – The Ninth Circuit cases are neither here nor there for the other side. That's correct. They need a Supreme Court case. That's correct. I would submit that under the ADPA, unless there were essentially a U.S. Supreme Court case on point or undistinguishable with these facts, this Court would have to defer to the lower court's assessment. With respect to prejudice, if I could just make a couple of comments. I know I'm quite a bit over my time, but certainly this Court has recognized in Eslaminia v. White that even if we find use of extrinsic evidence in this case, which amounted to juror misconduct, there's still no reversal on federal habeas unless we have a substantial and injurious effect on influence in determining the jury's verdict. And I don't see prejudice arising from these facts. Jeffers v. Woods puts forth several factors, one of which, and I think this is the most important, is the fact that this evidence, in my opinion, as I've argued earlier, is essentially cumulative to the evidence that was, in fact, presented at the trial. And, of course, the juror did make some observations or conclusions with respect to that evidence, but I don't see those conclusions as biased as far as one side or the other or the outcome. He essentially made the neutral comment that while you could put the testimony of the officers versus the testimony of the defendant, in contrast, maybe there wasn't as much conflict as the record tended to suggest. Now, that, of course, doesn't suggest anything about whether the defendant actually had a specific intent to steal. It simply suggests that there may have been a conflict in the evidence that was not quite as distinct as the parties would have suggested otherwise. But I don't see that as a comment in favor of the prosecution or the defense, and so certainly I think that mitigates the prejudicial nature of this juror's observation. And then finally, on the issue of guilt, the question, I think, really boils down to whether the juror's comments in this case were significant with respect to the question of intent to steal. Did the juror's extraneous observations really turn the balance for this jury as to whether this defendant harbored an intent to steal or not? And I don't think they did for several reasons. First of all, the officer's credibility, even to the extent that it was at issue as to what the officer saw the defendant doing, jumping over the fence or running through the fence, I don't think had anything to do with the officer's credibility with respect to whether the defendant was rooting through the car because those are two totally separate observations, and certainly one can see that it might be easier to perceive one than it would be to perceive the other. So I don't think that it undermined the officer's credibility as a whole. And ultimately in this case, I think the key evidence of guilty intent and an intent to steal was the flight, and the flight was significant. Even if the defendant fled through a hole in the fence, as he maintained in the first instance, the fact remained that it appears he fled anywhere from approximately one city block, and I believe he jumped a second fence to get behind in this garbage enclosure where he still retained property. He didn't drop all the property as he was running. He retained the CD player and the CDs, and he was hiding in this garbage enclosure where he was found by an officer and where he proceeded to flee yet again. And my reading of the record, which appears at RTs 191 through 193, is that he jumped a fence to get out of the garbage area and then ran and attempted to jump yet another fence, which was the one that was covered by the razor wire. And I think it's that flight with the property, and the record reflects that he had the compact disc player and the tape and the headphones. Up until the time he was hiding in the garbage area, that that more than anything indicates the evidence of intent to steal in this case. The question of whether he ran through a hole or over the fence in the initial instance really I don't think made much of a determination for this jury with respect to his intent. So in that sense, I would say it's not prejudicial. And I thank you for the Court's indulgence running over the time. I appreciate that. Would you like a minute? I've used up my time, so unless the Court has questions, I guess I won't keep talking. Does it really matter what happens after the police see him? Once you get spotted by the police, you know, things change quite a bit. And I'm not sure how much bearing any of that has on your intent to steal to begin with. You know, obviously you don't want to get caught for this stuff, because it's the worst thing, you get caught red-handed, literally. So it wouldn't surprise me that you sort of throw stuff out or drop it or whatever, where it would be much harder to connect to you. So I'm not all that sure that this business about the fence really makes any difference. So he dropped the coat or he threw it over the fence. You know, the best you could hope for at that point is to get away. But, you know, to get away with the loot and sort of separate things, the thing that he really wanted to keep or the things that he – it just doesn't strike me as very plausible. I see the Court's point, but I think what the Court should keep in mind is that the whole reason for the flight was that the police were approaching. It's not that he had the stuff and later saw that the police were following him and then decided – That's his story. Pardon me? I think it's nothing to do with the police testimony. I'm sorry? I mean, the police testimony was that they made a lot of noise coming down the street. They saw him at the car. Avery, I think, said he looked like a deer in a headlight. He's got a property that doesn't belong to him, and he's gotten it by appropriating it from a location that he shouldn't have been at. Well, of course, his story was that two other gentlemen had been rifling through the car. When he returned in the vicinity of the car, he got close and surprised them to scare them away because he thought they were stealing, attempting to steal Avery's belongings. But then when he got to the car, the items were on the ground. So it was his testimony that he came upon the items on the ground. He didn't take them out of the car. He picked them up. They didn't believe that. They were afraid. They did acquit him of robbery. They did acquit him of robbery. And so I think they believed that he was not rooting around in the car, didn't extract the items out of the car. So, I mean, I think what's interesting here is that the jury seemed to believe much of what he said. But he must have believed that these were not his items and he knew he was stealing them. Well, no, he agreed. He didn't contest that he carried them away, and he didn't contest that they weren't his items. The only issue was what was his intent. And he testified, as Judge Harvey pointed out, he testified that he wasn't rooting around in the car and the jury acquitted him of robbery. So all he was convicted of was the petty theft with a prior, unfortunately. So I see the court's point that if you think you've made off with something and then you see the police and you think you might get caught, you're just as likely to drop it as to keep going. The point here was that, and I don't think there was a dispute about this, the police were coming down this road very early in the morning, not many cars around, no one else there, making a rather loud noise because they sped up to get to where he was. And that he looked up and saw them. They thought they made contact with him. So he was well aware that the police were descending at the time that he left from the site. And so to follow the court's logic, seeing the police were there, he knows the area, he knows that there are a lot of fences. He may know about the hole, but there are other fences also. If he's familiar with that area, he must understand it's not a clean shot. He's got a police car chasing him. Then the most appropriate response would have been to drop everything right then and just get away. I mean, he saw a situation in which it looks like he met up with this car in order to get a CD player out of it. There were sort of disparate views about what had happened prior to that point. But one of them, which the jury may well have believed, was that he was solicited by Mr. Avery. It's hard to make the thing about the fence really do all the work you want it to. All I can say, Your Honor, is that it was the focus of the defense case. And I think, given that situation, that it was the focus of the case. We may think it wasn't the best case ever, but the focus of the case and the jury did seem to believe much of their case. That should make it important to this court also. Thank you, Your Honor. Thank you. Case is now in response mode. We are adjourned. Thank you.
judges: Kozinski, W. Fletcher, Bybee